John Heenan
Colette Davies
Bishop & Heenan Law Firm
1631 Zimmerman Trail
Billings, MT 59102
406-839-9091
john@bishopandheenan.com

Timothy M. Bechtold
Bechtold Law Firm, P.L.L.C.
PO Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| MICHAEL GEBAUER, KIM McDONALD, JASON DEMERY, and JOE JORDAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>JPMORGAN CHASE BANK, N.A.; BANK OF AMERICA, N.A.; and WELLS FARGO BANK, N.A.,<br><br>Defendants. | ) CV<br>)<br>) **COMPLAINT AND JURY DEMAND**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs Michael Gebauer, Kim McDonald, Jason Demery, and Joe Jordan, for themselves and all others similarly situated, allege as follows:

**Plaintiffs' Rights to Withhold Payment from Defendants**

1.      In 1975, the Federal Trade Commission (FTC) enacted a Rule titled as the "Trade Regulation Rule Concerning the Preservation of Consumers' Claims and Defenses." 16 C.F.R. §433.2.  It is now more commonly referred to as the "FTC Holder Rule" or the "Holder Rule."  The Holder Rule "is designed to prevent the widespread use of credit terms which compel consumers to pay *a creditor* even if the seller's conduct would not entitle the seller to be paid. It is designed to preserve the consumer's legally sufficient claims and defenses *so that they may be asserted to defeat or diminish the right of a creditor* to be paid, where a seller who arranges financing for a buyer fails to keep his side of the bargain."[1] That is, consumers can assert against Defendants the fraud

---

[1] Staff Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, published May 4, 1976, p.6. available at: https://www.ftc.gov/system/files/documents/rules/holder-rule/760504hidcrule.pdf

of Volkswagen Group of America ("Volkswagen" or "VW"), as described

below, and withhold payments from Defendants pending resolution of their

claims, including their claims for rescission due to fraud or illegality. As

required by the FTC Rule, each of the Defendants' installment contracts for

the purchase of each Plaintiff's Violating Vehicle states in 10-point bold:

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSENS WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEED HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

2.    Therefore, pursuant to the FTC Holder Rule, Plaintiffs[2] may assert against

Defendants all the same claims that they could assert against Volkswagen

related to the Violating Vehicles described below.

3.    Further, the Uniform Commercial Code chapter on Sales, in section 2.717,

as enacted by all states provides that:

"The buyer on notifying the seller of an intention to do so may deduct all
or any part of the damages resulting from any breach of contract from
any part of the price still due under the same contract."

4.    Again, because Plaintiffs are able to deduct their damages from the price

_____

[2] Whenever in this Complaint the word "Plaintiffs" or "Plaintiffs'" is used in any

sense or manner, it refers collectively to the named Plaintiffs and to the classes of

persons that they seek to represent, regardless of whether "the class" is

specifically stated.

still due on the contract, Plaintiffs may withhold from Defendants payments due on their Violating Vehicles.

**The Volkswagen Diesel Emissions Fraud**

5.     Since at least 2009, Volkswagen intentionally violated the laws of the United States and the regulations of the United States Environmental Protection Agency (EPA) by selling automobiles in the United States that had a sophisticated software algorithm in the engine control module. The purpose of the software algorithm, defined in the Clean Air Act as a "defeat device," was to detect when a car's engine was being tested for compliance with emissions standards, and switch the car to an operating mode that would enable the car to appear to pass vehicle emissions standards. At all times other than in emissions testing mode, the engine control module would suppress emission controls and switch the car's operating mode to emit up to forty times the quantity of nitrogen oxides allowed by federal emissions standards.

6.     Nitrogen oxides are highly reactive gases that contribute to ground-level ozone, fine particulate, and nitrogen dioxide pollution. Exposure to these pollutants is a recognized cause of respiratory illnesses.

7. The EPA has established regulations with strict emissions standards, and every vehicle sold in the United States must meet these emissions standards to help control air pollution.

8. On September 18, 2015, the EPA sent VW a Notice of Violation informing VW that the EPA had discovered the defeat device in 2.0 liter diesel engines in at least the following diesel models of VW's vehicles (the "Violating Vehicles"): 2009-2015 VW Jetta; 2009-2014 Jetta Sportwagen; 2012-2015 VW Beetle; 2010-2015 VW Golf; 2015 Golf Sportwagen; 2012-2015 VW Passat; and 2010-2015 Audi A3.

9. Discovery may reveal that additional vehicle models and model years are properly included as Violating Vehicles. For example, the EPA has charged that certain 3.0 liter diesel engines may also have defeat device installed, including the 3.0-liter diesel six-cylinder 2014 VW Touareg, the 2015 Porsche Cayenne, and the 2016 Audi A6 Quattro, A7 Quattro, A8, A8L and Q5.

10. Since VW introduced its 2.0L TDI Clean Diesel engine in 2008, VW has touted it as a "fantastic power train" that "gives very good fuel economy" that "is also good for the environment because it puts 25% less greenhouse gas

emissions than what a gasoline engine would, . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%, . . . [and is] clean enough to be certified in all 50 states." (Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to *The Business Insider*, October 9, 2009.)

11.     Mark Barnes did not add that the VW clean diesel vehicles were engineered to be able to detect when they were being tested and to switch the manner in which the emissions system operated to be able to achieve those reductions in nitrogen oxides.  Mark Barnes also did not disclose  that, after circumventing the emissions laws of the United States, every one of VW's clean diesel vehicles' emissions systems were programmed to run in a mode that would result in up to 40 times the allowable quantities of nitrogen oxides being released into the atmosphere under normal operating conditions.

12.     VW relied on this fraud to position itself as the market leader in automotive diesel sales in the United States. According to VW's documents, VW had captured 78% of the automotive diesel sales in the United States by 2013.

13.     The EPA has directed VW to recall all the Violating Vehicles and repair them

to comply with emissions standards. Even if a repair is possible, which is not certain at this time, the repair will cause substantial changes in performance and efficiency in the Violating Vehicles, thus Plaintiffs' vehicles will no longer perform as they did when purchased and as advertised.

14. In its September 18, 2015 letter to Volkswagen, the EPA said that it was illegal for VW to offer to sell the Violating Vehicles or place them in the stream of commerce.

15. Approximately 500,000 Volkswagen vehicle purchase contracts are tainted by the fraud of VW. Many if not most of purchases of the Violating Vehicles are financed by consumers. On information and belief, many of the consumers financed the purchase of Violating Vehicles through the Defendants named in this lawsuit.

16. In addition to final dispositive relief, Plaintiffs seek a preliminary injunction to prevent the Defendants from:

   (1) accepting payments from Plaintiffs and the class that they seek to represent on installment contracts that relate to the Violating Vehicles, and

   (2) reporting derogatory or negative information on credit reports of

consumers who currently own the Violating Vehicles and who are, by federal law, excused from payment due to the fraud and illegality of the contracts that they entered for the purchase or lease of the Violating Vehicles.

**Jurisdiction and Venue**

17. Jurisdiction is proper in this Court because Plaintiffs seek rescission and restitution and injunctive relief for a nationwide class or subclass of persons which, because of the amounts involved and the value of the request injunctive relief,  implicates the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453, and 1711–1715.

18.  Venue is proper in the United States District Court for the District of Montana pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a) because  Plaintiff Michael Gebauer resides in this division. Each of the Defendants' contacts with this District are sufficient to subject it to personal jurisdiction, and venue is proper in this division because Plaintiff Michael Gebauer resides in this division.

**Parties**

19.     Plaintiff Michael Gebauer, a resident of Missoula, Montana, purchased a

2010 Volkswagen Jetta wagon TDI diesel from Dick Hannah Volkswagen in

Vancouver, Washington. Plaintiff Gebauer financed the purchase through

JPMorgan Chase Bank, dba Chase Auto Finance.

20.     Plaintiff Kim McDonald, a citizen of the State of Washington and a resident

of Seattle, Washington, purchased a 2011 Jetta Sportwagen TDI from

University Volkswagen in July, 2011. Plaintiff McDonald financed the

purchase through Bank of America.

21.     Plaintiff Jason Demery, a citizen of the State of California and a resident of

San Jacinto, California, purchased a 2013 Jetta TDI from Moss Motors in

Moreno Valley, California in September, 2012. Plaintiff Demery financed

the purchase through Wells Fargo Bank.

22.     Plaintiff Joe Jordan, a citizen of the State of Delaware and a resident of

Seaford, Delaware, purchased a 2012 Jetta TDI from Heritage Volkswagen

in Parkville, Maryland. Plaintiff Jordan financed the purchase through Wells

Fargo Bank.

21.     Each Plaintiff purchased his or her vehicle, in part, because of the

"CleanDiesel" system as advertised by VW that touted the cleanliness of the engine system for the environment and the efficiency and power and performance of the engine system.

22.     Defendant JPMorgan Chase Bank, N.A., with its principal place of business located at 111 Polaris Parkway, Columbus, Ohio, is a subsidiary of JPMorgan Chase & Company, which has its principal place of business located at 270 Park Avenue, New York, New York. At all times relevant to this lawsuit, JPMorgan Chase Bank financed the purchase of Violating Vehicles under the Volkswagen and Audi brand names to consumers in the United States.

23.     Defendant Bank of America, N.A. has its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina. At all times relevant to this lawsuit, Bank of America financed the purchase of Violating Vehicles under the Volkswagen and Audi brand names to consumers in the United States.

24.     Defendant Wells Fargo Bank, N.A. has its principal place of business located at 101 North Phillips Avenue, Sioux Falls, South Dakota, and is a subsidiary of Wells Fargo & Company, which has its principal place of business located in San Francisco, California. At all times relevant to this lawsuit, Wells Fargo

financed the purchase of Violating Vehicles under the Volkswagen and Audi brand names to consumers in the United States.

**Deceptive Trade Practices**

25.    Over a long period of time in massive multi-media marketing campaigns, Volkswagen made uniform representations that the Violating Vehicles were of a particular standard, quality, or grade when they were and are not, and that they would perform as represented when they did not, and, as set forth above, made false and/or misleading statements regarding the capacity and characteristics of Violating Vehicles that, as set forth above, were unfair or deceptive, had and continue to have the capacity to deceive the public, cause injury to Plaintiffs, and were made in violation of the deceptive trade practices in all states.

26.    In its communications with and disclosures to Plaintiffs, Volkswagen intentionally concealed and/or failed to disclose that the Violating Vehicles included a software program designed to cheat emissions testing, and that the true emissions of those vehicles were far higher than claimed. Those omissions were unfair or deceptive, had and continue to have the capacity to deceive the public, cause injury to Plaintiffs and the Class, and were

made in clear violation of the deceptive trade practices acts of all states.

27. Volkswagen had exclusive knowledge that the Violating Vehicles had and have the defects set forth above, facts unknown to Plaintiffs. Volkswagen's exclusive knowledge of these material facts gave rise to a duty to disclose such facts, which it failed to perform.

28. The representations made by Volkswagen and the facts concealed and/or not disclosed by Volkswagen are material facts that were likely to deceive reasonable consumers, and that a reasonable consumer would have relied on in deciding whether or not to purchase a Violating Vehicle manufactured by Volkswagen.

29. The representations made by Volkswagen and the facts concealed and/or not disclosed by Volkswagen detrimentally affected the public interest. There is an inherent public interest in reducing emissions from vehicles, and properly advertising emission levels. The Violating Vehicles did not operate as advertised and thus negatively affected the public interest.

30. Plaintiffs justifiably acted or relied to their detriment on Volkswagen's affirmative representations and the concealed and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Violating

Vehicles.

31.    Had Volkswagen disclosed all material information regarding the Violating

Vehicles, Plaintiffs would not have purchased and used the Violating

Vehicles. The concealed facts are the cause and producing cause of the

injury to Plaintiffs and the Class.

32.    Volkswagen knew, or was reckless in not knowing, that its statements

about its "CleanDiesel" vehicles were false and/or misleading.

33.    By the conduct described herein, Volkswagen engaged in unfair methods of

competition and/or unfair or deceptive act or practices in the conduct of

business, trade, or commerce.

34.    As a producing cause and/or as a direct and proximate result of

Volkswagen's violations of the forgoing law, Plaintiffs have been injured

and damaged.

35.    Plaintiffs are entitled to all of the damages, remedies, fees, and costs

available under the Uniform Deceptive Trade Practices Act as enacted by

their states and the states of all class members.

36.    Plaintiffs will provide or already have provided any required notice to

appropriate entities regarding Volkswagen's unfair and deceptive trade

practices.

**Implied and Written Warranty**

**Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)**

37. Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

38. Volkswagen's Violating Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

39. Plaintiffs are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

40. Volkswagen is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

41. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

42. As described herein, in the course of each consumer's purchase of a Violating Vehicle, Volkswagen provided Plaintiffs with "implied warranties" and "written warranties" as those term are defined in 15 U.S.C. § 2301. Volkswagen, through persons authorized by Volkswagen, made communications with each consumer buyer such that Volkswagen

extended an express warranty to each buyer, warranting that the Violating

Vehicle would be free of defects in design and/or workmanship and/or

would be merchantable and/or fit for the particular purpose for which it

was sold, and each buyer reasonably relied upon such warranty. The

communications and actions between the buyers and the seller, including

Volkswagen, were sufficient for Volkswagen to be deemed the seller of the

Violating Vehicles and to create privity, if necessary, between each

consumer and Volkswagen.

43. Volkswagen has breached these warranties as described in more detail

herein. Without limitation, Volkswagen's Violating Vehicles are defective,

as described above, which resulted in the problems and failures also

described above, and make the Violating Vehicles unfit for their intended

purpose and not merchantable.

44. By Volkswagen's conduct as described herein, including Volkswagen's

knowledge of the defects inherent in the Violating Vehicles and its action,

and inaction, in the face of the knowledge, Volkswagen has failed to comply

with its obligations under its written and implied promises, warranties, and

representations.

45. In its capacity as a warrantor, and by the conduct described herein, any attempts by Volkswagen to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective the software and supporting systems is null and void.

46. All jurisdictional prerequisites have been satisfied.

47. Plaintiffs and members of the Class are in privity with Volkswagen in that they purchased the software from Volkswagen or its agents.

48. As a result of Volkswagen's breach of warranties, Plaintiffs are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

**Breach of Express Warranty**

49. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

50. Consistently over many years and in massive multi-media "Clean Diesel" and other advertising campaigns Volkswagen made numerous representations, descriptions, and promises to Plaintiffs regarding the performance and emission controls of its diesel vehicles.

51. Volkswagen, however, knew or should have known that its representations, descriptions, and promises were false. Volkswagen was aware that it had installed defeat devices in the vehicles it sold to Plaintiffs.

52. Plaintiffs reasonably relied on Volkswagen's representations in purchasing "clean" diesel vehicles. Those vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiffs, those vehicles included devices that caused their emission reduction systems to perform at levels worse than advertised. Those devices are defects. Accordingly, Volkswagen breached its express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

53. As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiffs have suffered significant damages and seek the relief described below.

**Breach of Implied Warranty**

54. Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

55. Consistently over many years and in massive multi-media "Clean Diesel" and other advertising campaigns, Volkswagen made numerous

representations, descriptions, and promises to Plaintiffs regarding the functionality of Volkswagen's "clean" diesel technology.

56. Plaintiffs reasonably relied on Volkswagen's representations in purchasing the Violating Vehicles.

57. As set forth throughout this Complaint, Volkswagen knew that its representations, descriptions and promises regarding its diesel engines were false.

58. When Plaintiffs purchased Volkswagen's diesel vehicles, the vehicles did not conform to the promises or affirmations of fact made in Volkswagen's promotional materials, including that the vehicles were designed to meet the most demanding environmental standards. Instead, as alleged above, those vehicles were designed to cheat those standards, and the vehicles emitted far higher levels of pollution than promised.

59. The Violating Vehicles thus failed to conform to Volkswagen's implied warranty regarding their functionality.

60. As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiffs suffered significant injury when Volkswagen sold the cars that, it is now clear, are worth far less than the

price Plaintiffs paid for them. Accordingly, Plaintiffs, for themselves and all others similarly situated, seek the relief described below.

**Rescission and Restitution**

61.     All the claims and causes of action asserted above may be asserted against Defendants, just as if they were asserted against Volkswagen. Therefore, Plaintiffs, for themselves and all members of the Class that they seek to represent, and on the basis of fraud or illegality, seek rescission of the purchase financing contract that was entered into in relation to the purchase of a Violating Vehicle by class members who, at the time of this Complaint still own one or more of the Violating Vehicles. Plaintiffs also seek restitution of all amounts paid on the finance contracts. Plaintiffs are entitled to rescission because by delivering Violating Vehicles instead of the "Clean Diesels" Plaintiffs expected, VW violated the UCC's Perfect Tender Rule and such violation substantially impairs the value of the Violating Vehicles to Plaintiffs.

62.     Plaintiffs seek rescission and restitution based upon the common law as it regards contract induced by fraud and/or illegal contracts, the deceptive

trade practices statutes of all states and territories of the United States,[3]

and according to the Uniform Commercial Code §2.717 [4], as enacted by all

states except Louisiana.

63.    Plaintiffs hereby give notice to Defendants of the intent of Plaintiffs and

the class members to rescind the contracts and return their Violating

Vehicles, to reject the Violating Vehicles sold to them as failing to conform

to the contracts, to revoke any acceptance of the Violating Vehicles, and of

their intent to withhold the remainder of the purchase price still owing

under their contracts.

**Injunctive Relief**

64.    Plaintiffs seek injunctive relief during the pendency of this suit. If Plaintiffs

and class members continue to make monthly payments for fear that

Defendants will injure their ability to obtain credit, they are deprived of the

---

[3] *See, e.g.* Alabama: Ala. Code § 8-19-1 et seq.; Arizona: A.R.S. § 44-1522;
California: Cal. Civ. Code § 1688-1693; Montana: MCA §28-2-1711; and Texas:
Tex. Bus. & Com. Code § 17.50(b)(3) (Analyses of all of the states' deceptive trade
practices law, and statutory and common law rescission remedies, will be
presented with Plaintiffs' class certification motion).

[4] U.C.C. 2-717 "The buyer on notifying the seller of an intention to do so may
deduct all or any part of the damages resulting from any breach of contract from
any part of the price still due under the same contract."

remedy that the FTC and the UCC has allowed them. They also then open

themselves to arguments that they have waived or ratified the fraud and

illegality that induced them into the financing contracts. If Plaintiffs stop

making payments, as is their right, Defendants may report derogatory

information to credit reporting agencies. The requested injunctive relief is

so that Plaintiffs and the class members may withhold payment to

Defendants for the Violating Vehicles without fear that Defendants will ruin

Plaintiffs' credit by reporting derogatory credit information such as late

payments, no payments, voluntary surrender, repossession and the like.

Because of the fraud and illegality in the financing contracts, Plaintiffs and

the class should not be prejudiced in any way for exercising their right to

withhold payment.  Defendants should be enjoined from reporting to any

credit reporting agency any derogatory information related to the

withholding of payments.

65.    At this point there can be no room for argument about the fact that VW

defrauded hundreds of thousands of Americans who purchased the

Violating Vehicles. VW has admitted it; the fraud is now common

knowledge. The fraudulent scheme is detailed in lawsuits, by the EPA in

press releases, and by the testimony of VW presented before Congress. The probability of success on the merits of this case for Plaintiffs and the class members is high.

66. Though many class action cases have been filed, none seek an adequate remedy for consumers financed by companies unrelated to Volkswagen. Plaintiffs and the class members are without an adequate remedy at law. If Plaintiffs and the class members continue to make payments for fear of credit ruination by Defendants, Plaintiffs and the Class will have lost the valuable rights granted to them by the FTC and UCC; they will also run the risk of waiving their rescission rights, or at least facing a defensive issue that is not now present. Once the legal argument is made that Plaintiffs and the class waived or ratified the fraud by continuing to make payments, the legal claim of Plaintiffs and the class is irreparably harmed. If Plaintiffs and the class seek to withhold their payments without the protection of an injunction against derogatory credit reporting, innocent consumers duped by VW's fraud will be further victimized by Defendants. When Plaintiffs and the class members tender or surrender their Violating Vehicles back to Defendants, as may be required in order to preserve their rescission claims,

they will be in need of substitute vehicles and credit to purchase or lease

substitute vehicles. If Defendants are permitted to report derogatory credit

information about Plaintiffs and the Class members who withhold

payments, then Plaintiffs and the Class members will be unable to purchase

substitute vehicles or only to be able to purchase them at higher interest

rates due to the derogatory credit reporting by Defendants.

67.    Further, a preliminary injunction will further the public interest as

expressed by the FTC Holder Rule. The rule is in place to prevent the

situation where the consumer has a valid claim against the seller, but

would, without the Rule, still have to pay for the fraud tainted vehicles

pending the dispute. To give effect to the FTC Holder Rule and balance the

hardship between the innocent purchasers and Defendants, a preliminary

injunction is appropriate.

**Class Certification**

68.    Plaintiffs seek certification of a class of consumers who purchased and still

own or owe money on one or more of the Violating Vehicles and financed

the purchase through one or more of the Defendants, with a subclass for

consumers who financed through JPMorgan Chase Bank, a subclass for

consumers who financed through Bank of America, and a subclass for consumers who financed through Wells Fargo Bank.

69. The class is so numerous that joinder of all members is impracticable; VW has estimated the class size of Violating Vehicles to be nearly 500,000. The class of Violating Vehicles financed by Defendants to consumers is expected to be several thousand persons.

70. There are questions of law or fact common to the class, including whether the class members are entitled to rescission of their financing contracts due to the fraud of VW.

71. The claims of the representative Plaintiffs are typical of the claims of the class; all seek rescission of their financing contracts due to the fraud and illegality that has saturated those contracts.

72. The representative Plaintiffs and their attorneys will fairly and adequately represent the class.

73. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

74. Questions of law and fact common to the class members predominate over

any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**WHEREFORE**, Plaintiffs, for themselves and all other similarly situated, demand judgment against Defendants as follows:

1.    For rescission or cancellation of the financing agreements related to the purchase of the Violating Vehicles, and restitution of amounts paid under the contracts.

2.    For a preliminary injunction to prevent any reporting of derogatory or negative information released to the financing  of Violating Vehicles through Defendants;

2.    For an award of attorney's fees and costs as provided by any applicable provision of law.

3.    For such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 20th day of November, 2015.

/s/Timothy M. Bechtold
Bechtold Law Firm, PLLC

John Heenan
Colette Davies
Bishop & Heenan Law Firm

Attorneys for Plaintiffs